IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **Docket No. 2:23-cr-00016** |
| | : | **HONORABLE JEFFREY L. SCHMEHL** |
| ARUN SAVANI *et al* | : | |

**SUPPLEMENTAL MEMORANDUM OF LAW
IN SUPPORT OF ARUN SAVANI'S PENDING RULE 29 MOTION**

Even when viewed in the light most favorable to the government, the evidence against Arun Savani ("Arun") failed to meet the "beyond a reasonable doubt" standard for a combination of legal and factual reasons. This memorandum addresses the relevant criminal counts in the following sequence: (1) the healthcare fraud counts, (2) the money laundering counts, (3) the tax fraud counts, (4) the immigration fraud conspiracy count, (5) the obstruction of justice count, and (6) the RICO count.[1]

**STANDARD OF REVIEW**

A district court must grant a defendant a judgment of acquittal if, after viewing the evidence in the light most favorable to the prosecution, no rational jury could have found the essential elements of the offense beyond a reasonable doubt. *See, e.g.*, *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Although a court must "draw all reasonable inferences in favor of the jury's verdict" and "may not weigh evidence or determine the credibility of witnesses," *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005), "a conviction based on speculation or conjecture cannot

---

[1] Arun Savani is electing not to challenge the substantive immigration fraud count under Rule 29.

1

stand." *United States v. Cartwright*, 359 F.3d 281, 286 (3d Cir. 2004); *see also* United States v. Coleman, 811 F.3d 804, 807 (3d Cir. 2016) ("[M]ere suspicion or speculation is insufficient.").

## THE EVIDENCE

The Court is familiar with the evidence that was presented to the jury. In summary form, viewed in the light most favorable to the government, the evidence as to Arun proved the following:

### A. Health Care Fraud Allegations

1.      In late 2012, two Medicaid MCOs (Keystone and AmeriHealth) and their Medicaid TPA (DentaQuest) terminated from their Medicaid networks all dental practices owned and operated by Dr. Bhaskar Savani ("Bhaskar"). Although the termination letters stated that the terminations were "without cause," Keystone, AmeriHealth, and DentaQuest terminated the Savani dental practices because of concerns with Bhaskar's adherence to certain billing requirements. *See* GX 308, 317, 318; Day 12 Tr., at pp. 137-139.

2.      Following the termination, Dr. Andrew Dormeshian and Dr. Amen Dhyllon formed new companies (SmileKrafters LLC, Advantage Dental LLC, and Faces & Braces LLC). *See* GX 405, 490. Although Dr. Dormeshian and Dr. Dhyllon formally were the sole owners of those companies, American Dental Management Group—a dental services organization ("DSO") that Bhaskar owned and controlled, *see, e.g.*, GX 509-14—provided substantial administrative and management services to the companies. *See* Day 17 Tr., at pp. 142-143; In addition, Arun exercised signatory authority on the companies' bank accounts. *See id.*, at p. 132; GX 372, 378.

3.      Between 2013 and 2015, SmileKrafters LLC, Advantage Dental LLC, and Faces & Braces LLC obtained Medicaid provider participation agreements with several MCOs. This included Keystone and AmeriHealth. *See* GX 320, 321, 335, 414. But it also included MCOs that

had not terminated the Savani-owned dental practices from their networks. *See* Day 26 Tr., at p. 22.

4. As part of the process of obtaining the Keystone and AmeriHealth participation agreements for SmileKrafters LLC, Advantage Dental LLC, and Faces & Braces LLC, Dr. Dormeshian and Dr. Dhyllon each made false representations to Keystone and/or AmeriHealth that Bhaskar was not involved in any way in the ownership, management, or operation of those companies. *See* Gx 413; Day 14 Tr., pp. 50-51, 165; Day 17 Tr., pp. 130-131.

5. After joining the Keystone and AmeriHealth networks, SmileKrafters LLC, Advantage Dental LLC, and Faces & Braces LLC submitted in the ordinary course of business insurance reimbursement claims to Keystone and AmeriHealth. The insurance reimbursements paid on these claims went into bank accounts over which Arun had signatory authority.

### B. Money Laundering Allegations

6. The insurance reimbursement proceeds received by the SmileKrafters LLC, Advantage Dental LLC, and Faces & Braces LLC bank accounts were subsequently transferred to other bank accounts over which Arun and/or Bhaskar had signatory authority. *See, e.g.*, GX 501-503; 504-1, 504-3, 504-4, 504-6. These transfers were executed by or at the direction of Arun and Bhaskar. *See* Day 9 Tr., at 14.

### C. Tax Fraud Allegations

7. Arun owned (fully or partly) various pass-through entities whose taxable income passed through to Arun's personal income tax return.

8. The tax returns for those pass-through entities were prepared by Sunil Philip based on "P&L" statements that had been prepared by individuals employed by Savani-owned companies. *See* Day 21 Tr., p. 131.

9.      The P&L statements included expenses that were not, in fact, legitimate business expenses.  Some of those expenses flowed through to the entities' tax returns and, therefore, had the effect of reducing Arun's taxable income on his personal tax return.  *See id.*; GX 610-2-R.

10.      Arun also received some cash distributions that were not fully reported on the P&L statements provided to Sunil Philip and, therefore, may not have been reflected on Arun's personal tax returns.  *See* GX 610-2-R; GX 637.

11.      Arun participated in meetings with Sunil Philip and his staff in relation to the preparation of business and personal tax returns.  *See* Day 16 Tr., at p. 18.

### D.  Immigration Fraud Allegations

12.      Companies owned by Arun sponsored H1-B visa applications for several individuals between approximately 2007 and 2020.  Some of these H1-B visa applications misrepresented the jobs that the prospective employees would be performing, and some also misrepresented the salaries that they would be receiving.  Arun signed these applications.  *See* GX 120-1, 120-2.

13.      Rather than working in the specialized positions described in their H1-B petitions, the following employees sponsored by Arun may at times have been performing non-specialized work: Piyusha Patel, Jayesh Vaghasiya, Ramesh Bhanderi, Jayesh Patel, Rushit Patel, Hitesh Goyani, Bharatkumar Parasana, Vivek Savani, Maulikumar Patel, and Jayeshkumar Kothiya.

14.      None of the aforementioned H1-B petitioners were involved in obtaining Medicaid network contracts for SmileKrafters LLC, Advantage Dental LLC, or Faces & Braces, and none were directly involved in the completion or submission of reimbursement claims to insurance companies.

15. The H1-B visa holders implicated by factually false H1-B petitions represented a very small fraction of the total W2 work force employed by Savani-owned companies. *See* DX 442.

### E. Obstruction of Justice Allegations

16. In or around June 2014, Arun was present at a meeting that included several H1-B visa holders, including Piyusha Patel. At the meeting, Arun told the H1-B visa holders that, if federal agents ever questioned the H1-B visa holders about their jobs, the holders should "stick with what is in your petition paperwork." *See* Day 18 Tr., at p. 104-105.

17. Approximately five years after that meeting, Arun became aware that a grand jury was conducting an investigation into the Savani-owned companies' H1-B visa petitions. *See* Day 19 Tr., p. 131 (stipulation).

18. In February 2022, Piyusha Patel testified before the grand jury. During her testimony, she falsely testified that she had been working as an accountant when, in fact, she had been working as the manager of a single dental office in Iowa. *See* Day 18 Tr., at p. 118-120.

### F. RICO Allegations

19. Arun sponsored roughly two dozen H1-B visa petitions (including renewal petitions) that were filed over a roughly 12-year period. *See* GX 120-2.

20. Reimbursement claims for SmileKrafters LLC, Advantage Dental LLC, and Faces & Braces were submitted to Keystone and AmeriHealth for several years.

21. For several years, insurance reimbursement proceeds received into the SmileKrafters LLC, Advantage Dental LLC, and Faces & Braces LLC bank accounts were routinely transferred to the bank accounts of other companies owned or controlled by either Arun or Bhaskar.

22.    Arun's personal tax returns for the years 2013 to 2017 may have understated his taxable income, the result of overstated business expenses and understated cash receipts on the tax returns of pass-through entities.

## ARGUMENT[2]

For various reasons, Rule 29 requires the Court to vacate the jury's verdict against Arun on all but Count 3.

## I.   The Healthcare Fraud Counts (Counts 9, 10-11, 13, 16-18, 20-24)

The indictment essentially charged two completely different versions of healthcare fraud. The first version was a conspiracy to submit insurance reimbursement claims that misrepresented that a credentialed doctor performed the services when, in fact, a different, non-credentialed doctor The headings in the Argument section of this memorandum that have asterisk  performed the services (the "doctor swapping scheme").  The second version was a conspiracy to obtain network participation contracts from Keystone and AmeriHealth by misrepresenting that Bhaskar was not involved in the ownership, control, management, or operation of SmileKrafters LLC, Advantage Dental LLC, and Faces & Braces (the "nominee contracts scheme").

### A.   The Government Failed to Prove the Doctor Swapping Scheme, Let Alone That Arun Agreed to Participate in It.

The doctor swapping scheme suffered from a complete failure of proof, both generally and with respect to Arun specifically.  At trial, the government failed to prove that the dental practices at issue were engaged in a scheme to submit claims for Medicaid reimbursement under the name of a credentialed rendering provider when, in fact, the services had been provided by a doctor who was not credentialed (or provisionally credentialed) at the time the services were rendered.  At

---

[2] The Argument sections with asterisks are sections that defendant Ola Radomiak joins.

most, the evidence may have shown a handful of instances in which a claim was billed under the name of a credentialed doctor when, in fact, the services had been performed by a doctor that was a few days or weeks away from being credentialed or provisionally credentialed. *See, e.g.*, Day 20 Tr., at 18-23. The government thus failed to prove a scheme to submit claims that made false material representations regarding the rendering provider. *See United States ex rel. Rockey v. Ear Institute of Chicago*, 92 F. Supp. 3d 804 (N.D. Ill. 2015) ("As discussed above, [the relator's] NPI claims are limited to those for which Medicare would have reimbursed the Ear Institute even if the audiologists' NPIs had been listed on the claim forms. Thus, Ear Institute Defendants' failure to use the correct NPI could not have 'influence[d] the payment or receipt of money' by the government because the government would have paid the claim [if the rendering audiologist's] NPI was on the form.").

The government also failed to prove that, if there was a scheme to engage in doctor swapping on a claim form to get a claim paid based on fraudulent pretenses, Arun participated in that scheme. Even when viewed in the light most favorable to the government, the evidence failed to show that Arun was aware of such a scheme, let alone that Arun agreed to participate in it. The government did admit into evidence an email from March 4, 2013 that, viewed in the light most favorable to the government, would have put Arun on notice that dental practices were still engaged in some instances of "supervisory billing." *See* GX 426. But the email involved supervisory billing for PPO and HMO patients—*not Medicaid patients*. The government acknowledged that the indictment was limited to healthcare fraud schemes against specific MCOs. *See* Day 26 Tr., at p. 118. Moreover, the government did not submit any evidence that the PPOs and HMOs at issue in GX 426 did not permit the supervisory billing discussed in GX 426. The

7

government also failed to prove that, if Arun ever agreed to participate in a doctor swapping scheme, that scheme continued past January 17, 2018 (five years prior to the indictment).

### B. The Government Failed to Prove That Arun Agreed to Participate in a Fraudulent Nominee Contract Scheme.

The government proved through Dr. Dormeshian's and Dr. Dhyllon's testimony that Dr. Dormeshian and Dr. Dhyllon, during their efforts to obtain provider participation agreements with Keystone and AmeriHealth in 2013, 2014, and 2015, Dr. Dormeshian and Dr. Dhyllon falsely represented to Keystone and AmeriHealth employees, including Dr. Larry Paul, that Bhaskar was not involved in the management or operation of SmileKrafters LLC, Advantage Dental LLC, and Faces & Braces. The government, however, introduced *no evidence* that Arun was aware that those false representations had been made, let alone that Arun agreed Dr. Dormeshian and Dr. Dhyllon should make them. Thus, even if there was a scheme to defraud, the government failed to prove beyond a reasonable doubt that Arun knowingly and willfully participated in it. *See United States v. Pearlstein*, 576 F.2d 531, 537 (3d Cir. 1978). As the Third Circuit held in *Pearlstein*, if a defendant was not originator of the fraudulent scheme—which Arun clearly was not—the government must prove that he "willfully participated in it with knowledge of its fraudulent nature." *Id.*; *see also id.* at 541 ("[T]he evidence must indicate that the defendant[ ] had knowledge of the fraudulent nature of the . . . operation and willfully participated in the scheme with the intent that its illicit objectives be achieved."). In *Pearlstein*, the Third Circuit held that the government had failed to prove that salesman participated in a fraud scheme designed and perpetrated by their company's top executives. *See id.* at 541-546. So too here. If Dr. Dormeshian and Dr. Dhyllon (or others) made false representations to Keystone and AmeriHealth about Bhaskar's involvement, the government still was required to connect those false representations to Arun beyond a reasonable doubt. The government failed to do so.

8

The mere fact that Arun was aware that SmileKrafters LLC, Advantage Dental LLC, and Faces & Braces were formed for, in part, the purpose of acquiring provider participation agreements with Keystone and AmeriHealth is not itself sufficient to prove Arun's participation in a fraudulent nominee contract scheme. Turning the dental practices over to a "another owner entity" is the advice that Arun understood was being conveyed by Dr. Allen Finkelstein, the consultant hired by Bhaskar. *See* DX 429. Nor is it sufficient that Arun was aware that he and Bhaskar were exercising some degree of control over the management side of SmileKrafters LLC, Advantage Dental LLC, and Faces & Braces LLC. The government did not introduce any evidence that Keystone and AmeriHealth informed Arun, directly or indirectly, that such control would disqualify SmileKrafters LLC, Advantage Dental LLC, and Faces & Braces LLC from joining their Medicaid providers networks. Nor did the government introduce any evidence that, after Dr. Dormeshian and Dr. Dhyllon obtained the provider participation agreements, Keystone and AmeriHealth informed Arun, directly or indirectly, that his or Bhaskar's involvement in the management of SmileKrafters LLC, Advantage Dental LLC, and Faces & Braces LLC would result in termination.

At most, the government proved that Arun was aware that Keystone and AmeriHealth were unaware that Bhaskar, through the DSO that Bhaskar owned, was participating in the management of Dr. Dormeshian's and Dr. Dhyllon's companies and, in exchange for that work, was taking a share of the companies' revenues. That alone, however, is not sufficient to show Arun's knowledge of (and therefore his agreement to participate in) a nominee contract fraud. It is black letter law that, unless the defendant is under a legal duty to speak—which neither Arun nor any of his alleged co-conspirators were—a mere failure to disclose is not fraud. Thus, even if Arun agreed that the insurance companies should not be told about Bhaskar's involvement in the management

of SmileKrafters LLC, Advantage Dental LLC, and Faces & Braces LLC, that does not constitute a healthcare fraud offense. *See Chiarella v. United States*, 445 U.S. 222, 235 (1980) ("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak."); *United States v. Ali*, 620 F.3d 1062, 1070 n.7 (9th Cir. 2010) ("Absent an independent duty, such as a fiduciary duty or an explicit statutory duty, failure to disclose cannot be the basis of a fraudulent scheme.").

The government also failed to prove that Bhaskar's involvement in the administrative side of a dental practice owned by Dr. Dormeshian or Dr. Dhyllon was material to Keystone's or AmeriHealth's contracting or payment decisions. The government's theory was that Keystone and AmeriHealth would not have agreed to take SmileKrafters LLC, Advantage Dental LLC, or Faces & Braces LLC into their networks if they had known that Bhaskar was involved in the operation or management of those entities' dental practices. *See, e.g.*, Day 3 Tr. at 28. The government, however, failed to call at trial any of the relevant Keystone or AmeriHealth decisionmakers. The closest the government came to calling such a witness was Barry Major, but he was an executive with DentaQuest, which stopped serving as Keystone's and AmeriHealth's TPA around 2015. And, in any event, the government did not ask Mr. Major a single question about whether Bhaskar's involvement in the management of a dental or orthodontics practice owned by Dr. Dormeshian or Dr. Dhyllon would have been a dealbreaker for DentaQuest. Instead, they asked Mr. Major whether it would be a dealbreaker if Bhaskar was *an owner* of Dr. Dormeshian's dental practice. *See* Day 11 Tr., at pp. 110-116. The evidence showed that Bhaskar was not an owner of SmileKrafters LLC or Advantage Dental LLC. Instead, Bhaskar's DSO company provided Dr. Dormeshian's and Dr. Dhyllon's practices with DSO services, for which the DSO company was compensated prevailing market rates.

10

The fact that neither Keystone nor AmeriHealth terminated SmileKrafters LLC or Advantage Dental LLC from their networks—or even conducted any investigation—after being informed in April 2018 that Nin had purchased those entities, and that the provider participation agreements would be transferred to Nin, disproved the government's materiality theory. *See* DX 405. At a minimum, if Bhaskar's involvement in the administration of a dental practice was something that Keystone and AmeriHealth deemed material even beyond January 2018—the time frame required to plead a healthcare fraud within the applicable statute of limitations—they would have inquired into that fact after being informed that Nin was taking over SmileKrafters LLC and Advantage Dental LLC.

## C. The Healthcare Fraud Conspiracy Count Was Barred by the Statute of Limitations.*

The healthcare fraud conspiracy count (Count 9) also failed because it was not charged prior to the expiration of the five-year statute of limitations. The nominee contract theory, which is the only theory that could sustain Count 9 at this point,[3] is analogous to the fraud conspiracy theory that the First Circuit deemed time-barred in *United States v. Doherty*, 867 F.2d 47 (1st Cir. 1989). In *Doherty*, the defendant was charged with a mail fraud conspiracy arising from his cheating on police academy examinations to obtain a promotion to sergeant and then to lieutenant. *Id.* at 54. The evidence showed that the promotions were obtained in 1979, approximately seven years prior to indictment. *Id.* at 61. The government introduced evidence, however, that the

---

[3] As stated earlier in this memorandum, because the government did not prove a scheme to have services performed by non-credentialed doctors billed under the names and NPIs of credentialed doctors, the government did not prove any fraudulent doctor swapping scheme ever existed. Moreover, even if inappropriate doctor swapping had occurred at points in the past, the government did not introduce evidence sufficient to show such a scheme continued past January 17, 2018. And in any event, regardless of time frame, the government failed to introduce evidence that Arun ever agreed to participate (or did participate) in such a scheme.

defendant received these increased salary payments beyond 1981.  The government argued that this was sufficient to satisfy the statute of limitations.  The government argued that the purpose of the conspiracy was not to obtain the promotion for the sake of the promotion, but rather to obtain the enhanced salary payments that went along with it.  *Id.*  Thus, according to the government, the obtaining of the promotion did not accomplish the objective of the conspiracy, and each receipt of a salary payment was a new overt act.  *Id.*  The First Circuit rejected the government's argument. The First Circuit held that "where receiving the payoff merely consists of a lengthy, indefinite series of ordinary, typically noncriminal, unilateral actions, such as receiving salary payments, *and* there is no evidence that any concerted activity posing the special societal dangers of conspiracy is still taking place, we do not see how one can reasonably say that the conspiracy continues."  *Id.*

The First Circuit's reasoning in *Doherty* has been adopted by other circuits.  *See United States v. Grimm*, 738 F.3d 498, 503 (2d Cir. 2013).  In *Grimm*, the Second Circuit agreed with *Doherty*'s reasoning, contrasting "'payoffs'" that are obtained for long periods of time as a result of actions that are typically non-criminal with those that are achieved are a more compressed period of time, such as the "sales of the stripped warrants" at issue in *United States v. Salmonese*, 352 F.3d 608, 616 (2d Cir. 2003), which "were completed within ten weeks of the [fraud-tainted] public offering and were 'hardly indefinite in number or lengthy in duration.'" *Grimm*, 738 at 503.

Here, the government's attempt to define the objective of the conspiracy as the obtaining of insurance reimbursement—and not merely the obtaining of the provider participation agreements (*i.e.*, being let in to the Keystone and AmeriHealth Medicaid networks)—runs headlong into the principles established by *Doherty* and *Grimm*.  A provider participation agreement is analogous to the promotion that the defendant fraudulently obtained in *Doherty*.  The promotion that the defendant obtained in *Doherty* did not entitle him to any particular amount of

money—he still had to show up for the job and work.  Similarly, the provider participation agreements that Dr. Dormeshian and Dr. Dhyllon obtained did not entitle SmileKrafters LLC, Advantage Dental LLC, or Faces & Braces LLC any particular amount of money—they would receive reimbursement payments from the MCOs only if patients sought dental and orthodontic services there and received medically necessary services from credentialed doctors.  And, just as the salary payments in *Doherty* could continue indefinitely, a dental practice that is participating in an MCO's Medicaid network can continue to receive payments for *years* or even *decades* after joining the network.

### D.  The Substantive Healthcare Fraud Counts Fail for Lack of Proof.*

The substantive healthcare fraud counts (Counts 10-11, 13, 16-18, and 20-24) do not suffer from a statute of limitations problem, because they relate to reimbursement claims that SmileKrafters LLC, Advantage Dental LLC, or Faces & Braces LLC submitted to Keystone or AmeriHealth within five years of the indictment.  But they do suffer from two other fatal evidentiary defects.  First, as stated above, there is no evidence that Arun agreed to join a nominee contract fraud conspiracy.  Thus, Arun cannot be held responsible for allegedly fraudulent reimbursement claims submitted by his alleged co-conspirators (*i.e.*, he cannot be held liable on a *Pinkerton* theory for the acts underlying the substantive healthcare fraud counts).  Second, as a matter of law, the submission of a reimbursement claim for medically necessary services provided by a fully credentialed doctor cannot be converted into a substantive healthcare fraud offense merely because of a years-old, antecedent act of obtaining a provider participation agreement based on false representations regarding the ownership, management, or control of the medical practice.

The government introduced into evidence at trial a blank claim form, *see* GX 304, and so there is no dispute about what information must be provided on the claim form. Whether Bhaskar Savani was the owner, manager, or operator of the company seeking payment, or whether Bhaskar Savani's DSO provided DSO services to the company seeking payment, was not among the information the claim form required. The government did not introduce any evidence that any false information was presented on the claim forms underlying the substantive healthcare fraud counts of which the jury found Arun guilty. The government conceded that those counts were based entirely on the nominee contract theory. That is, the government stipulated that its theory was that the claims were fraudulent because the underlying provider participation agreements had been obtained through fraud years earlier. *See* Day 26 Tr., at pp. 116-117. As a matter of law, whether the provider participation agreement was obtained through fraud is not sufficient to prove that medically necessary reimbursement claims, for services rendered by fully credentialed doctors, were violations of 18 U.S.C. § 1347, where none of the information included on the claim forms was false.

The government's attempt to extend the statute of limitations by pointing to the reimbursement payments received *years* after the provider participation agreements were obtained creates precisely the dangers that the Supreme Court warned about in *Toussie v. United States*, 397 U.S. 112 (1970). In *Toussie*, the Supreme Court explained that a criminal statute of limitations "is designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past." *Id.* at 114-115. Here, the government's argument to evade a time bar on Count 9 would, if accepted, create precisely the danger of which *Toussie* warned. At a trial taking place in 2026, the defendants had to defend themselves against

accusations that they conspired to obtain provider participation agreements by fraud in 2013, 2014, and 2015.  And, according to the government, this is permissible because the dental practices that obtained those provider participation agreements sought and received Medicaid reimbursement for medically necessary care rendered to patients in 2018, 2019, 2020, and 2021.  That result cannot be reconciled with *Toussie*, and it underscores why this Court should hold that the facts here are analogous to the facts in *Doherty* and *Grimm*.

## II.  The Money Laundering Counts (Counts 25-37)*

The money laundering counts against Arun necessarily fail if the healthcare fraud counts against him fail.  Because, as stated above, the government failed to prove that Arun participated in any healthcare fraud scheme, the government failed to prove that he knowingly and willfully engaged in financial transactions involving the proceeds of a specified unlawful activity. Moreover, to the extent that the healthcare fraud scheme is defined as the obtaining of the provider participation agreements—rather than the subsequent receipt of reimbursement for medically necessary care later provided to patients—then the "proceeds" of the healthcare fraud scheme was not cash, but rather the participation agreements themselves.  If the reimbursement payments do not constitute fraud proceeds, then as a matter of plain statutory text, subsequent financial transactions involving those reimbursement payments cannot constitute money laundering.  *See* 18 U.S.C. §§ 1956(a), 1957(a).

## III.  The Tax Fraud Counts

The tax fraud counts fail for two very basic reasons.  First, the tax fraud conspiracy count fails because, even *assuming* that Arun knowingly and willfully understated his taxable income on his personal tax returns or caused businesses to understate their payroll taxes, *see* Indictment, p. 82, the evidence failed to establish that Arun conspired with anyone to do so.  Instead, the evidence

at most established unilateral action by Arun, which as a matter of law is not sufficient to prove a conspiracy charge. *See, e.g.*, *Elliott v. Paramount Film Distributing Corp.*, 27 F.R.D. 495, 496 (E.D. Pa. 1961) ("It is basic law that . . . one cannot conspire with himself."). This explains the jury's acquittal of Sunil Philip. Second, the substantive tax fraud count, which relates to Arun's 2017 personal income tax return, fails because the government did not introduce into evidence *any* of the pass-through entities' 2017 business tax returns that contributed to Arun's personal taxable income. Without introducing the business tax returns into evidence, the government asked the jury simply to speculate whether improper business deduction entries on the entities' P&L statements actually ended up being included on the entities' corporate tax returns.

Although the IRS Revenue Agent who testified as a summary witness stated on direct examination that she "trace[d] out" to company tax returns a "sample" of the improper business deduction entries on P&L statements, Day 21 Tr., at p. 131, she did not identify whether the "sample" she examined included any of the companies that were owned by Arun (which are the only companies that passed through to Arun's personal income tax return), as opposed to companies owned by Bhaskar or Nin. Thus, her summary testimony cannot substitute for admission of the actual business tax returns for the pass-through entities that Arun owned.

## IV. The Immigration Fraud Conspiracy Count

The immigration fraud conspiracy count (Count 2) fails for a similar reason that the tax fraud conspiracy count failed—the government proved, at most, unilateral conduct by Arun, rather than a conspiracy with another person. This explains the jury's acquittal of Bharatkumar Parasana, whose allegedly false H1-B visa petition was sponsored by Arun.

At trial, the government called only one witness whose allegedly false H1-B visa petition was both (i) sponsored by Arun, and (ii) submitted within five years of the indictment. That

16

witness was Jayesh Vaghasiya.  *See* Day 6 Tr., pp. 70-107.  None of Mr. Vaghasiya's testimony could support a jury finding beyond a reasonable doubt that he and Arun conspired to submit a false H1-B petition.  The government did not even establish that Mr. Vaghasiya was aware of the job description in his H1-B visa petition at the time it was submitted to USCIS, or any of the other contents of the petition.

If Arun did not conspire with Mr. Vaghasiya, then who did the government prove he conspired with? The answer is nobody.  Accordingly, even if the jury's verdict on Count 3 can be sustained, the jury's verdict on Count 2 cannot.

## V.  The Obstruction of Justice Count

The government chose to charge the obstruction of justice offense as a conspiracy to violate 18 U.S.C. § 1503.  In the Third Circuit, "the elements of a prima facie case of obstruction of justice are (1) the existence of a judicial proceeding; (2) knowledge or notice of the pending proceeding; (3) acting corruptly with the intent of influencing, obstructing, or impeding the proceeding in the due administration of justice; and (4) the action had the 'natural and probable effect' of interfering with the due administration of justice."  *United States v. Sussman*, 709 F.3d 155, 168 (3d Cir. 2013).  Here, the government's expectation on the obstruction of justice conspiracy count (Count 8) was that it would prove that Susan Malpartida perjured herself in the grand jury based on instruction that Bhaskar and Arun gave to her indirectly through Jayesh Vaghasiya.  Ms. Malpartida, however, did not testify at trial.  Moreover, Mr. Vaghasiya did not testify that Arun instructed him either to lie in a judicial proceeding or to instruct others to lie in a judicial proceeding.  *See* Day 6 Tr., at pp. 104-17.

Because Mr. Vaghasiya did not provide a link between Arun and Ms. Malpartida's false grand jury testimony, the government pivoted to Piyusha Patel's false grand jury testimony.  The

government argued at the original Rule 29 motion hearing that Count 8 could be premised on Piyusha Patel's trial testimony that she perjured herself in the grand jury, coupled with her testimony that Arun had told her at a meeting that the H1-B visa holders should "stick" to what was in their H1-B petitions if anyone asked them about their jobs.  *See* Day 26 Tr., pp. 146-147. The government argued: "[Her decision to lie to the grand jury], according to her, was the direct result of directions given to her by Arun Savani and a meeting that he held for all the H1-B employees to instruct them that when asked by federal authorities, they were to follow the false— follow what were in fact false statements in their H1-B application as they all well knew."  *Id.* at p. 147.

The problem with the government's argument is that the "meeting" at which, according to Piyusha Patel, Arun provided those instructions took place in or around June 2014.  This was *years* before there was a pending judicial proceeding, and nearly *five years* before the evidence showed Arun was aware of those proceeding.  This is fatal to Count 8.  As a matter of law, one cannot conspire to violate § 1503 if there is neither a pending judicial proceeding nor a judicial proceeding even on the near-term horizon.  As the Supreme Court held in *United States v. Aguilar*, "a person lacking knowledge that his actions are likely to affect a pending proceeding necessarily lacks the requisite intent to obstruct" in violation of § 1503.  The government's suggestion that Arun conspired with Piyusha Patel in June 2014 to obstruct a grand jury proceeding that did not exist until years later—and in which Piyusha Patel did not testify until 2022—makes no sense under *Aguilar*.  Thus, the government's pivot to using Piyusha Patel as the link between Arun and grand jury perjury fails as a matter of law.

### VI. The RICO Count

The RICO count against Arun failed for numerous reasons.

#### A. There Was No Conspiratorial Agreement by Arun.

The evidence did not prove beyond a reasonable doubt that Arun conspired to engage in a pattern of racketeering activity. As explained above, if the evidence was sufficient to prove any offense committed by Arun, it was merely that Arun made a unilateral decision to file a handful of false H1-B petitions. Such sporadic, unilateral conduct would not constitute a RICO conspiracy, because it would not have involved a RICO enterprise, a conspiratorial agreement with others, or a pattern of racketeering activity.

#### B. The Disparate Categories of Racketeering Acts Were Not Related to Each Other.*

The government failed to prove that the various categories of racketeering acts that the jury found Arun agreed should be committed—healthcare wire fraud, money laundering, tax wire fraud, and immigration fraud—were part of a single "pattern of racketeering." To show that these disparate categories of racketeering acts were part of the same "pattern of racketeering," the government had to prove beyond a reasonable doubt that they were "related." *HJ, Inc. v. Northwestern Bell*, 492 U.S. 229, 239 (1989). To satisfy the "relatedness" standard, racketeering acts must "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise [be] interrelated by distinguishing characteristics and not [be] isolated events." *Id.* at 239-240 (internal quotations omitted). It is not sufficient for the alleged predicate acts to have "vertical" relatedness (*i.e.*, relatedness to the RICO enterprise). They must also have "horizontal" relatedness (*i.e.*, they must be related to each other). *United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir. 1992). The "focus" of the analysis is "on the nature of the alleged criminal activity." *Banks v. Wolk*, 918 F.2d 418, 425 (3d Cir. 1990). The requirement of horizontal

relatedness "prevents [prosecutors] from pleading 'unrelated predicate acts . . . to extend the scope of the pattern of racketeering activity.'" *Cohen v. Cohen*, 993 F. Supp. 2d 414, 425 (S.D.N.Y. 2014). "[S]poradic and separate criminal activities cannot alone give rise to a pattern for RICO purposes." *U.S. v. Mark*, 460 F. App'x 103, 108 (3d Cir. 2012).  If an alleged crime is not sufficiently related to the other alleged crimes that comprise the RICO enterprise's alleged pattern of racketeering activity, then it is not properly considered part of the alleged RICO offense.  *See, e.g.*, *HTA-SCW Webb Med. A LLC v. Roskamp Mgmt.*, 2020 U.S. Dist. LEXIS 66178, at *19 (E.D. Pa. Apr. 14, 2020) (holding that the defendant's alleged predicate acts were not sufficiently "related" to each other to form a single pattern).

Here, the evidence failed to show that the immigration fraud activities—where the jury answered "1" to the question of how many acts Arun agreed should be committed—was related to the healthcare wire fraud, money laundering, or tax wire fraud activities.  Among other evidentiary deficits, there was no evidence that the immigration fraud assisted the supposed "enterprise" in accomplishing healthcare fraud, money laundering, or tax fraud.  The evidence also failed to show that the tax wire fraud activities related to the healthcare wire fraud or money laundering activities. With respect to Arun in particular, the business tax returns that were relevant to his income were not even companies that received insurance reimbursement payments.

### C. The Healthcare and Money Laundering Offenses Could Not Themselves Constitute a Pattern of Racketeering, Nor Could the Immigration Fraud or Tax Fraud Acts.*

Because the government cannot prove a pattern of racketeering by aggregating the immigration fraud and tax fraud acts with each other or with the healthcare fraud and money laundering acts, the government can only prove a pattern by showing either that (i) the healthcare fraud and money laundering acts by themselves sufficed to prove a pattern, or (ii) either the

immigration fraud or tax fraud acts by themselves sufficed to prove a pattern. The government cannot show that.

With respect to the healthcare wire fraud and money laundering acts (which admittedly are related insofar as the money laundering allegations piggyback on the healthcare wire fraud allegations), those fail to constitute a pattern for several reasons. First, as stated above, the government failed to prove the doctor swapping scheme, and so its healthcare wire fraud scheme allegations were limited to the nominee contract theory. Properly construed, the nominee contract theory involved sporadic, temporally limited fraudulent conduct—specifically, fraud to obtain provider participation agreements at single points in time in 2013, 2014, and 2015. That does not constitute a pattern. Moreover, insofar as the provider participation agreements were the sole fruits of the fraud scheme, there were no subsequent financial transactions that could have constituted money laundering. Second, even if the nominee contract fraud were deemed to include all the subsequent reimbursement claims that SmileKrafters LLC, Advantage Dental LLC, and Faces & Braces LLC submitted to Keystone and AmeriHealth, this still would not constitute a pattern of racketeering. Even where a fraud scheme persists for years, federal courts have held that the scheme does not constitute a pattern of racketeering when it simply consists of repeated identical acts of fraud that targets a discrete, limited set of victims. *See, e.g.*, *Bank & Trust Co. v. Solomon*, 1987 U.S. Dist. LEXIS 2536, (E.D. Pa. April 2, 1987) (Scirica, J.). As Judge Scirica explained in *Solomon*, "mere repetition of an act against a single victim suggests no ongoing design and no continuity . . . ." *Id.*, at \*5; *see also Efron v. Embassy Suites, Inc.*, 223 F.3d 12, 19 (1st Cir. 2000) (collecting cases); *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265 (D.C. Cir. 1995) (holding that the combination of a "single scheme, single injury, and few victims . . . makes it virtually impossible for plaintiffs to state a RICO claim"). Here, even if the

reimbursement claims were deemed to be part of the nominee contract fraud scheme, the scheme still involved at most two victims (Keystone and AmeriHealth) and would have involved the mere repetition of the same fraudulent act—the submission of claims for reimbursement for medically necessary services—against those two victims.  Such a scheme lacks the continuity that the "pattern of racketeering" element requires.  The government cannot convert the healthcare wire fraud conduct into a RICO pattern by tacking on money laundering allegations based on nothing more than financial transactions involving the insurance reimbursements that the companies received from Keystone and AmeriHealth.

With respect to the tax wire fraud and immigration fraud acts, they lack the requisite continuity as well.  The tax wire fraud acts were quintessential sporadic crimes.  Even *assuming* that the government proved that Arun agreed that the individual members of the "enterprise" should file false tax returns every year, filing false tax returns each year is not continuous criminal conduct.  Instead, it is criminal conduct that occurs on a single day—April 15th—each year.  That is the definition of sporadic, isolated activity.  With respect to the immigration fraud, the jury's verdict against Arun—specifically, a finding that Arun agreed that only one act of immigration fraud should occur—itself forecloses the immigration fraud conduct from constituting a pattern of racketeering activity on its own.

Respectfully submitted,

Dated: April 17, 2026

/s/ *Aaron M. Katz*
Aaron M. Katz
AARON KATZ LAW LLC
399 Boylston Street, 6th Floor
Boston, MA 02116
(617) 915-6305
akatz@aaronkatzlaw.com

22

## CERTIFICATE OF SERVICE

I served a copy of the foregoing on all parties via the CM/ECF system.

/s/ *Aaron M. Katz*